# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MPOWER COMMUNICATIONS ) 
CORPORATION, et al., ) 
     ) 
    Plaintiffs, ) 
     ) 
    v. )    **No. 04 C 6909**
     ) 
EDWARD C. HURLEY, et al., )    **Judge Ruben Castillo**
     ) 
    Defendants, ) 
     ) 
   &amp; ) 
     ) 
MCI, INC., ) 
     ) 
    Plaintiff, ) 
     ) 
    v. )    **No. 04 C 7402**
     )    **(consolidated case)**
ILLINOIS COMMERCE ) 
COMMISSION, et al., ) 
     ) 
    Defendants. ) 

## MEMORANDUM OPINION AND ORDER

The Illinois Commerce Commission ("ICC") entered an order, pursuant to the

Telecommunications Act of 1996 ("1996 Act"), Pub. L. No. 104-104, 110 Stat. 56 (codified in

scattered sections of 47 U.S.C.) and the Federal Communication Commission's ("FCC") rules,

47 C.F.R. §§ 51.501-51.515, setting rates for unbundled network elements ("UNEs") that the

Illinois Bell Telephone Company ("SBC"), which is the incumbent local exchange carrier

("ILEC"), must make available to competing local exchange carriers ("CLECs") that enter into

interconnection agreements with SBC. SBC and several CLECs—specifically Mpower

Communications Corp., Forte Communications Inc., CIMCO Communications, Inc., and XO

Illinois, Inc.—have filed summary judgment motions requesting federal review of the ICC's

order. These CLECs also claim that the underlying ICC proceeding was preempted by the 1996 Act. For the reasons provided below, we grant the CLECs and SBC's motions for summary judgment. (R. 34-1; R. 59-1.) Accordingly, we reverse three aspects of the ICC's order and remand this case back to the ICC with directions to re-visit these specific issues.

## PROCEDURAL HISTORY

This case has a complex and complicated procedural history dating back to 2002 when SBC filed a tariff—docketed with the ICC as 02-0864—under 220 Ill. Comp. Stat. 5/9-201 to update the rates at which it must lease UNEs to CLECs. After the ICC initiated an investigation into SBC's proposed rates, the Illinois legislature passed a law (220 Ill. Comp. Stat. 5/13-408) that abated SBC's tariff proceeding and required the ICC to update these rates in a specified manner within 30 days. Various CLECs challenged the law in federal court asserting that it was preempted by the 1996 Act. The district court agreed and issued an injunction declaring the state law unlawful. The Seventh Circuit affirmed and stated that the "ICC is compelled by the injunction to reinstate the proceeding in its Docket 02-0864, which the state law had terminated, and to proceed to decision as expeditiously as possible." *AT&T Communications of Ill., Inc. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 411 (7th Cir. 2003).

The ICC complied with the Seventh Circuit's directive. Within approximately seven months, the ICC re-opened SBC's abated tariff proceeding, permitted dozens of parties to intervene, heard extensive expert testimony and arguments, and issued a single-spaced, 299 page order.[1] The ICC was concerned that the proceeding might be preempted by the 1996 Act so specifically addressed that issue. (ICC Order at 289-94.) The ICC's order states that the

---

[1] Except for Mpower Communications Corp., all of the CLECs involved in this case intervened and provided testimony in the ICC proceeding. (ICC Order at 4.)

"CLECs requested [that] the Commission move forward with this case but treat it as a generic rate investigation" and asserted that "there was consensus among the parties that the Commission could move forward with this proceeding as a generic rate investigation under the [1996 Act]."[2] (*Id.* at 291-92.) Ultimately, the ICC held that the proceeding was not preempted by the 1996 Act and decided to treat it procedurally as a state-law tariff proceeding but substantively as a generic ratemaking proceeding. (*Id.* at 9.)

The ICC's order sets the UNE rates that SBC must make available to CLECs that enter into interconnection agreements with SBC and explains why these rates are TELRIC-compliant. TELRIC stands for "total element long-run incremental cost" and is the specific methodology that the FCC requires state regulators to use when setting UNE rates.[3] *See* 47 C.F.R. § 51.505(b). "TELRIC obliges both incumbents and state regulators to set prices based on the long-run costs that would be incurred to produce the services in question using the most-efficient telecommunications technology now available, and the most efficient network configuration." *AT&T*, 349 F.3d at 405. To set TELRIC-compliant UNE rates, the ICC undertook studies of recurring and non-recurring costs and analyzed labor rates, common costs, annual charges, and many additional miscellaneous factors. A substantive description of the ICC's order will be provided in the analysis section of this opinion due to the ICC's order's length, its technical complexity, and the substantial number of issues raised by the parties.

---

[2] Despite these statements, the CLECs, at various times, objected to the ICC proceeding on preemption grounds. Specifically, they objected to the imposition of deadlines and to SBC's assertion that it filed the tariff involuntarily. (*Id.* at 290-92.) In response to these objections, the ICC noted that it was not bound by any specific deadlines and concluded that SBC filed its tariff voluntarily. (*Id.* at 290, 293.)

[3] The specific UNEs at issue in this case are known as "loops." Loops are the wires that connect customers' premises to the local telephone network.

## LEGAL STANDARDS

We review the ICC's legal conclusions *de novo* and its factual determinations under the arbitrary and capricious standard. *See Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 383-85 (7th Cir. 2004). Under the arbitrary and capricious standard, we will affirm all factual decisions that are "supported by substantial evidence" and are "the result of a deliberate principled reasoning process." *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 587 (6th Cir. 2002). A deliberate principled reasoning process requires consideration of all the necessary information as well as the provision of a meaningful explanation. *See Ill. Bell Tel. Co. v. Wright*, 245 F. Supp. 2d 900, 905 (N.D. Ill. 2003). Because we must defer to the ICC's judgment and technical expertise, we cannot re-weigh evidence, decide credibility questions, or supplant the ICC's judgment. *Ill. Bell Tel. Co. v. Wright*, No. 00 C 7050, 2003 WL 22757752, at *6 (N.D. Ill. Nov. 20, 2003). In short, a decision is only arbitrary and capricious if it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *US West Comm., Inc. v. Hix*, 986 F. Supp. 13, 18 (D. D.C. 1997).[4]

## ANALYSIS

The parties challenge numerous aspects of the ICC's order. Before we can address these substantive issues, we must first answer one exceedingly thorny procedural question: whether the ICC proceeding was preempted by the 1996 Act. This case's procedural history makes the preemption question particularly convoluted. The case started in the ICC, jumped over to the Illinois legislature, worked its way through the federal courts up to the Seventh Circuit, was sent

---

[4] We have not set forth the legal standards for summary judgment motions because there are no genuine issues of material fact and at least one party is entitled to a judgment as a matter of law. This action seeks judicial review of an ICC order, which is in the nature of an administrative appeal, and can appropriately be decided through cross-motions for summary judgment by reviewing the ICC record.

4

back to the ICC, and then returned—hopefully for the last time—to federal court. Along the way, the Seventh Circuit directed the ICC to "proceed to a decision," *AT&T*, 349 F.3d at 411, and the CLECs conceded that the ICC proceeding was not preempted, (*see* ICC Order at 291-92). The Seventh Circuit, however, did not specifically address preemption when it issued its directive, and the CLECs' earlier concessions have no effect on this jurisdictional question. *See Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 860 (7th Cir. 1996) (stating that "preemption affects the subject matter jurisdiction of the district court, [so] is always open to [] consideration"). Thus, we must determine whether the ICC proceeding was preempted by the 1996 Act.

## I.     Preemption of the ICC Proceeding

The ICC proceeding would be preempted if it was inconsistent with the 1996 Act. *See* 47 U.S.C. § 271(b). The Seventh Circuit has twice held that orders issued by state public utility commissions were preempted by the 1996 Act. First, the Seventh Circuit held in *Wisconsin Bell v. Bie*, 340 F.3d 441, 444 (7th Cir. 2003) (emphasis in original), that a state commission cannot order an ILEC to file tariffs setting interconnection rates because the state's tariffing requirement "*has* to interfere with the procedures established by the [1996 Act]." The 1996 Act permits a state commission to "arbitrate" an interconnection agreement only if the parties are unable to negotiate the agreement. *See* 47 U.S.C. § 251(b)(1). The Seventh Circuit explained that the state's tariffing requirement interferes with these procedures because it:

> places a thumb on the negotiating scales by requiring one of the parties to the negotiation, the local phone company, but not the other, the would-be entrant, to state its reservation price, so that bargaining begins from there. And it allows the other party to challenge the reservation price, and try to get it lowered, by challenging the tariff before the state regulatory commission, with further appeal possible to a state court—even though Congress, in setting up the negotiation procedure, explicitly excluded the state courts from getting involved in it. At the very least, the tariff requirement complicates the contractual route by authorizing a parallel proceeding.

*Id.* In *Indiana Bell Telephone Company, Inc. v. Indiana Utility Regulatory Commission*, 359 F.3d 493, 497-98 (7th Cir. 2004), the Seventh Circuit also held that a state commission's order interfered with the 1996 Act's procedures because it "set up baselines for interconnection agreements" by imposing on the ILEC "unnegotiated obligations in its provision of local service." The preempted order adopted an unnegotiated, commission-created performance assurance plan that would have been "available to new entrants into the local service market, 'independent of the Sections 251/252 interconnection agreement process.'"[5] *Id.* at 496.

The CLECs assert that the ICC's order interferes with the Section 252 negotiation procedures because, like the order in *Indiana Bell*, it sets up "baselines for interconnection agreements." (R. 61, Pls.' Reply at 4-5.) The ICC's order, however, is distinguishable from the order in *Indiana Bell*. The *Indiana Bell* order, on the one hand, imposed "unnegotiated obligations" on the ILEC that were "available to new entrants into the local service market 'independent of the Sections 251/252 interconnection agreement.'" *Ind. Bell*, 359 F.3d at 496. The ICC's order, on the other hand, does not impose any obligations; it merely establishes rates that "will only be available to [CLECs] that enter into an interconnection agreement with SBC or will be incorporated into current interconnection agreements depending on the change of law provisions contained therein." (ICC Order at 293.) Furthermore, the ICC's order explicitly states that "[t]he prices contained in a final interconnection agreement may be lower or higher

---

[5] "'Performance assurance' plans are not creatures of the Act. However, the FCC has said that the 'existence of a satisfactory performance monitoring and enforcement mechanism is probative evidence that the [ILEC] will continue to meet its section 271 obligations after a grant of [long-distance] authority." *Id.* at 496.

than those contained in the tariff based on the give and take inherent in the negotiation process."[6] (*Id.*)

In arguing that the ICC's order sets up "baselines for interconnection agreements," the CLECs are broadly interpreting the term "baselines" to mean a starting point for the negotiation. This dictionary definition, however, does not accord with the facts of *Indiana Bell*. The order in *Indiana Bell* did not propose a starting point for future negotiations; it imposed unnegotiated obligations that were completely independent of the Section 252 negotiation process. Moreover, the CLECs' expansive definition would deprive the ICC of any ability to set rates or promulgate rules even though the ICC has this authority pursuant to 47 C.F.R. § 51.505(e)(2) as well as Paragraph 693 of the First Report and Order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 (rel. Aug. 8, 1996) ("*Local Competition Order*").[7]

The fact that the ICC's order is distinguishable from *Wisconsin Bell* and *Indiana Bell* does not establish that it is not preempted by the 1996 Act. Preemption depends on whether the ICC's tariff proceeding was inconsistent with the 1996 Act. *See* 47 U.S.C. § 271(b); *Wis. Bell,* 340 F.3d at 443. The CLECs assert that the ICC proceeding was inconsistent with the 1996 Act because SBC did not attempt to negotiate new rates for its interconnection agreements before

---

[6] The ICC's order is also distinguishable from the order in *Wisconsin Bell*. SBC was not required to file the tariff, and the order does not set up a parallel state proceeding. (*See* ICC Order at 293-94; *see also* R. 42, SBC's App., Ex. 30, CLECs' ICC Brief at 12 (stating "this proceeding is distinguishable from [*Wisconsin Bell*]").

[7] Section 51.505(e)(2) identifies the administrative procedures that the ICC must follow when it "considers a cost study for purposes of establishing rates," and Paragraph 693 of the *Local Competition Order* states that the ICC may conduct a TELRIC economic cost study "in a rulemaking and apply the results in various arbitrations."

initiating the tariff proceeding.[8] (R. 61, Pls.' Reply at 4-5.) SBC contends that the ICC proceeding was consistent with the 1996 Act because Section 252(g) specifically contemplates that state commissions will conduct consolidated proceedings to deal with issues that would invariably arise in multiple arbitrations. (R. 48, SBC's Resp. at 7.) Section 252(g) states:

> Where not inconsistent with the requirements of this chapter, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253 of this title, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this chapter.

47 U.S.C. § 252(g). The only proceedings authorized by Section 252 are mediations under Section 252(a)(2), arbitrations under Section 252(b)(1), interconnection agreement approvals under Section 252(e)(1), and reviews of statements of general terms and conditions under Section 252(f)(2).[9] The ICC proceeding did not result from the consolidation of any such proceedings. Thus, it was not a Section 252(g) consolidated proceeding.

Although the ICC proceeding was not a Section 252(g) consolidated proceeding, it was nonetheless consistent with the 1996 Act because it qualifies as a Paragraph 693 rulemaking. Paragraph 693 of the *Local Competition Order* states that:

> States may review a TELRIC economic cost study in the context of a particular arbitration proceeding, or they may conduct such studies in a rulemaking and apply the results in various arbitrations involving [ILECs]. In the latter case, states must replace any interim rates set in arbitration proceedings with the permanent rate resulting from the separate rulemaking. This permanent rate will take effect at or about the time of the conclusion of the separate rulemaking and will apply from that time forward.

---

[8] The CLECs never raised this specific objection during the ICC proceeding and stated that they considered the proceeding "a generic pricing docket that is permissible under the Telecommunications Act." (R. 42, SBC's App., Ex. 31, CLECs' ICC Reply Brief at 2.) *See* note 2, *supra*, discussing the objections that the CLECs made during the ICC proceeding.

[9] Sections 214(e), 251(f), and 253 proceedings are not relevant to this case.

8

This paragraph gives the ICC the authority to conduct cost studies in a rulemaking and apply the results in subsequent arbitrations. The ICC proceeding will influence the Section 252 negotiation in substantially the same manner as the procedures set forth in Paragraph 693. Moreover, the CLECs have failed to explain, especially in light of the concessions they made during the ICC proceeding, why the ICC proceeding should not be considered a Paragraph 693 rulemaking. Thus, even though SBC did not first attempt to negotiate interconnection agreements with the CLECs, we find that the ICC proceeding is fully consistent with Paragraph 693 of the *Local Competition Order*. Accordingly, we hold that the ICC proceeding was not preempted by the 1996 Act.

## II.    Review of the ICC's Order

The ICC's 299-page order sets the UNE rates that SBC must make available to CLECs that enter into interconnection agreements with SBC and explains why these rates are TELRIC-compliant. Nearly two-thirds of this order address recurring and non-recurring cost studies, and—not surprisingly—all of the parties' challenges, except one, are directed at these studies. The CLECs challenge five aspects of the recurring cost studies and three aspects of the non-recurring cost studies, while SBC only raises a single challenge to the recurring cost studies. In addition to the recurring and non-recurring cost studies, the ICC also had to determine labor rates, common costs, shared costs, and various other charges. The CLECs also challenge the ICC's common cost determination.

### A.    Recurring Cost Studies

A recurring cost study is a computer program or model that determines an ILEC's recurring costs: the costs that the ILEC incurs each time a CLEC uses a leased UNE. To run the recurring cost studies, the ICC had to design the programs and input TELRIC-compliant

variables. The recurring cost studies contained three major inputs: (1) the fill factors, (2) depreciation, and (3) the cost of capital. The CLECs challenge the ICC's calculation of the fill factors and depreciation while SBC challenges how the ICC calculated the cost of capital. In addition to these three major inputs, the recurring cost studies also require numerous smaller inputs. The CLECs challenge two of these minor inputs: installation costs and Digital Loop Carrier ("DLC") investment costs. After considering all of the parties' challenges, we reverse two aspects of the ICC's order because, as explained below, they are inconsistent with TELRIC.

### 1. The Three Major Inputs

#### a. The Fill Factors

Fill factors are percentages that represent a telephone network's idle capacity. A network with a lot of idle capacity would have low fill factors while a network with little idle capacity would have high fill factors. Even an efficient telephone network will have some idle capacity to ensure that new customers can quickly obtain service, to protect against possible spikes in demand, and for use in the event of an equipment failure. *See AT&T*, 349 F.3d at 405. The percentage of idle capacity will directly affect recurring costs because the ILEC will include the cost of the idle capacity in its UNE lease rates. For example, if 10% of a telephone network were idle, the ILEC would recoup the cost of that unused portion from the remaining 90% of the network. It would determine a UNE's recurring cost by dividing the UNE's long-run cost by the fill factor, which in this example would be 0.90 because 90% of the network is in use or "filled." If, however, 90% of the network was idle, the ILEC would divide the UNE's long-run cost by 0.10. *See id.* Accordingly, high fill factors result in lower recurring costs and low fill factors result in higher recurring costs.

The ICC had to input TELRIC-compliant fill factors —the fill factors that would exist if SBC's network had been built using the most efficient, currently available technology—into its recurring cost studies. *See id.* The ICC considered at least six different methods and ultimately decided to use the upwardly-adjusted actual fill factors method. (ICC Order at 67.) The upwardly-adjusted actual fill factor method is quite straight-forward: adjust SBC's actual fill factors upward to account for perceived network inefficiencies.[10] Using this method, the ICC upwardly adjusted SBC's actual fill factor for its distribution plants by 15% and its fill factors for its feeder plants and DLCs by 7.5%. (*Id.* at 67.)

The CLECs assert that these specific adjustments were arbitrary and capricious. (R. 35, Pls.' Mem. at 14.) We disagree. These specific adjustments were recommended by Dr. Qin Liu. (R. 62, Pls.' Reply App., Ex. 2, Liu Testimony at 28-29.) Dr. Liu recommended them after explaining why the upwardly-adjusted actual fill factor method was reasonable, why SBC's current network was overbuilt, why it was "unattainable if not impossible" to determine precisely how inefficient SBC's network was, and the general principles supporting the recommended adjustments.[11] (*Id.* at 20-28.) The ICC was fully aware that these specific adjustments were

---

[10] The ICC concluded that SBC's actual fill factors were not TELRIC-compliant because of "the accumulative result of overbuilding over time, which is a result of incomplete information, imperfect forecasts and changed circumstances." (*Id.* at 60, 62.)

[11] The CLECs attempt to discredit Dr. Liu by asserting that she lacked enough information to advocate using upwardly-adjusted actual fill factors because she stated that she would only recommend this method if she could collect sufficient information. (*See* R. 61, Pls.' Reply at 10; R. 62, Pls.' Reply App., Ex. 3, Liu Testimony at 38.) There is, however, no evidence in the record indicating that she failed to collect the requisite information. The CLECs point to her statement that "information required for the calculation of this FCC hypothetical fill factor is largely unavailable," (R. 61, Pls.' Reply at 10; R. 62, Pls.' Reply App., Ex. 2, Liu Testimony at 17), but FCC hypothetical fill factors are different than upwardly-adjusted actual fill factors. Indeed, her inability to calculate FCC hypothetical fill factors is the reason she recommended using upwardly-adjusted actual fill factors. (R. 62, Pls.' Reply App., Ex. 2, Liu Testimony at 17-18.)

based on presumptions rather than specific calculations. While the ICC acknowledged that it was "troubled" by the lack of specific calculations, it nonetheless found that they were reasonable. (ICC Order at 67.)

The lack of specific calculations does not render the ICC's decision arbitrary and capricious. The ICC's decision is supported by substantial evidence because it is supported by Dr. Liu's testimony. It is also the result of a deliberate principled reasoning process. The ICC considered the strengths and weaknesses of the various methods (including the very argument advanced here by the CLECs (*see id.* at 48-49)) and ultimately decided to adopt Dr. Liu's recommendations. The ICC not only explained its reasoning, but also frankly noted its concerns. (ICC Order at 67.) The ICC has technical expertise that this Court lacks and, having heard all the evidence, was in the best position to make this difficult decision. We cannot re-weigh the evidence, decide credibility issues, or supplant the ICC's judgment. Accordingly, we find that the ICC's decision to follow Dr. Liu's recommendations was not arbitrary and capricious.

The CLECs nonetheless claim that the ICC's decision was arbitrary and capricious because it silently passed over a contradiction, *see Schurtz Communications v. F.C.C.*, 982 F.2d 1043, 1050 (7th Cir. 1992), by failing to explain why fill factors would have decreased over time, (R. 35, Pls.' Mem. at 14-15). In 1996, the ICC set rates using higher fill factors that were determined using a different methodology: target fill factors.[12] (ICC Order at 59.) The target fill factor method attempts to calculate efficient fill factors by determining the utilization rate above which it is more cost-effective to add capacity than to increase utilization. The ICC's purported

---

[12] The earlier proceeding was not as in-depth as the current proceeding. (*See* R. 45, ICC's Resp. at 12 (stating that the ICC "was presented with only two fill factor proposals—target fill and usable capacity fill—and its decision at that time was necessarily based on a determination that target fill was more reasonable than usable capacity fill").)

"failure" to explain why fill factors would have decreased from 1996 to 2003 does not render its decision arbitrary and capricious. The ICC explained that it was not bound by its 1996 determination and explained why it decided against target fill factors. (*See* ICC Order at 59, 64.) More importantly, the complained-of "failure" was outside the scope of the ICC's order. To determine TELRIC-complaint UNE rates, the ICC did not have to specifically justify and explain why it was using a different method or inputting a different number. It was not determining whether the rates it set in 1996 were currently TELRIC-complaint; it was independently setting new rates. The ICC reasonably and deliberately concluded that upwardly-adjusted fill factors were more appropriate than the target fill factors it had previously used. Nothing more is required, so the absence of a specific explanation for the decreasing utilization rate does not undermine the reasonableness of the ICC's decision-making process.

The CLECs also assert with the ICC's rationale for rejecting the target fill factor method "carries no weight." (R. 61, Pls.' Reply at 11.) Even if the ICC's rationale for rejecting target fill factors was erroneous, we would still affirm the ICC's decision because we have already found that its decision to use upwardly-adjusted actual fill factors was reasonable. After all, there is more than one way to calculate TELRIC-compliant fill factors.[13] *See AT&T*, 349 F.3d at 405 ("TELRIC is a framework rather than a formula; there is considerable play in the joints.") This Court lacks the technical expertise to determine which method is the most reasonable method of calculating forward-looking fill factors, which is the precise reason we cannot supplant the ICC's judgment.

---

[13] Interestingly, one of the methods that the CLECs advocated before the ICC was, in the ICC's view, "similar in concept" to the upwardly-adjusted actual fill factor methodology. (ICC Order at 65.)

Finally, the CLECs claimed that the ICC's order "creates an arbitrary and capricious 'price squeeze,'" (R. 35, Pls.' Mem. at 15), but backed off this argument in their reply brief by stating that it only "sets up the potential for a 'price squeeze,'" (R. 61, Pls.' Reply at 11). The CLECs have not provided this Court with sufficient information to determine whether a "price squeeze" *might* exist nor have they properly explained how that would render the ICC's decision arbitrary and capricious. Thus, we are unpersuaded by this final, undeveloped argument.

### b.  Depreciation

Under TELRIC, depreciation must reflect the "true changes in economic value of an asset" over time. *Local Competition Order* ¶ 703; *see also* 47 C.F.R. § 51.505(b)(3). To calculate depreciation, the ICC had to determine the economic life, which is also known as the depreciation life, of SBC's assets and the rate at which the asset is depreciated over its useful life. (ICC Order at 67.) Neither party has challenged the depreciation rate that the ICC used, but the CLECs challenge the ICC's deprecation lives. Longer depreciation lives reduce recurring costs while shorter depreciation lives increase recurring costs.

The ICC considered two methods for calculating depreciation lives: financial depreciation lives and FCC depreciation lives. (*Id.* at 77.) Financial depreciation lives are the depreciation lives used for financial reporting purposes with the Securities and Exchange Commission, which are based on Generally Accepted Accounting Practices ("GAAP"). FCC depreciation lives are the lives that the FCC previously adopted for regulating interstate telephone services. The FCC has found that both methods are consistent with TELRIC and has not mandated that state commissions use either one.[14]

---

[14] *See* Notice of Proposed Rulemaking, *In the Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, 18 F.C.C.R. 18945, ¶ 96 (rel. Sept. 15, 2003) ("*TELRIC*

The ICC concluded that financial depreciation lives "are appropriate for determining the economic life of SBC's assets." (ICC Order at 77.) It explained that this method "both reflects and encourages the use of new efficient technologies, as well as investment in infrastructure." (*Id.*) It also noted that "SBC's ability to compete in the long-distance market will foster accelerated levels of competition in the local market, thus shortening the useful economic life of its equipment."[15] (*Id.*) It rejected FCC depreciation lives because they "pre-date the 1996 Act and the TRO, [so] they may no longer indicate risks associated with facilities-based competition." (*Id.*) Accordingly, it concluded that financial depreciation lives "are more in tune with current and forward-looking conditions" so "are more in line with TELRIC principles." (*Id.*)

The CLECs assert that the ICC had limited discretion because "the FCC has made clear that use of financial depreciation lives for computing UNE costs is rarely appropriate." (R. 35,

---

*NPRM*") (stating that "the Commission has found both FCC regulatory lives and financial book lives to be consistent with TELRIC principles" and that "the Commission declined to mandate one set of asset lives or the other"); *see also* Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978, ¶ 688 (rel. Aug. 21, 2003), as modified by Errata, 18 F.C.C.R. 19020 (rel. Sept. 17, 2003) ("*Triennial Review Order*" or "*TRO*") (stating that "state commissions continue to have discretion with respect to the asset lives they use in calculating depreciation expense"); *see also Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 519 (2002) (stating that TELRIC "recognizes no particular useful life as a basis for calculating depreciation costs" and that "the FCC committed considerable discretion to state commissions on these matters").

[15] The ICC also noted that it agreed with the rationale of a recent decision by the Indiana Regulatory Utilities Commission. *See In the Matter of the Commission Investigation and Generic Proceeding of Rates and Unbundled Network Elements and Collocation for Indiana Bell Telephone Company, Incorporated d/b/a SBC Indiana Pursuant to the Telecommunications Act of 1996 and Related Indiana Statutes*, 2004 Ind. PUC LEXIS 117, 170-72 (rel. Jan. 5, 2005) ("*Indiana Proceeding*").

Pls.' Mem. at 17.)  This argument is based on the following paragraph in an FCC arbitration order:

> We find that Verizon has not demonstrated that financial book lives are a more appropriate measure of the actual economic life of an asset. Verizon did not document or explain in significant detail the methodologies, studies, or data that it, or its auditor, relied on in developing asset lives, nor did it demonstrate that these lives are in fact compliant with GAAP.

*In the Matter of the Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Telecommunications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc., and for Expedited Arbitration*, 18 F.C.C.R. 17722, ¶ 116 (rel. Aug. 29, 2003) ("*Virginia Arbitration Order*").  We disagree with the CLECs' characterization of the *Virginia Arbitration Order*.  We must defer to the FCC's interpretation of its own rules, *see Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 386 (7th Cir. 2004), but the FCC did not state that financial depreciation lives are "rarely appropriate."  It only stated that Verizon had not met its burden of proof.  Furthermore, subsequent to issuing this arbitration order the FCC stated that both FCC regulatory lives and financial lives are "consistent with TELRIC principles" and "declined to mandate one set of asset lives or the other."  *TELRIC NPRM* ¶ 96.  Thus, the *Virginia Arbitration Order* did not limit the ICC's discretion.

The CLECs next assert that SBC did not meet its burden of proof, so the ICC's decision is speculative and unsupported by substantial evidentiary.  (R. 35, Pls.' Mem. at 18; R. 61, Pls.' Reply at 14-15.)  They assert that the "*only* evidence submitted by SBC was a study by Technology Futures, Inc. ("TFI") that sought to justify the use of extremely short loop lives based on the assumed replacement of copper phone lines."  (R. 35, Pls.' Mem. at 18 (emphasis in original).)  The FCC has criticized TFI's studies as "extremely aggressive in their projections,"

*Virginia Arbitration Order* ¶ 118, but this critique does not preclude the ICC from relying on a TFI study. Moreover, the ICC heard extensive testimony from TFI's president, Dr. Lawrence Vanston.[16] (*See* R. 42, SBC's App., Exs. 17-18, Vanston Testimony.) The CLECs patently dismiss his testimony as speculative but did not support this assertion with any citations to his actual testimony. (R. 61, Pls.' Reply at 14.) Even if we had the expertise to determine that TFI's assumptions were overly aggressive, we cannot re-weigh evidence.[17] The ICC's decision to use financial depreciation lives is supported by substantial evidence and is the result of a deliberate principled reasoning process, so we must affirm.[18]

### c. The Cost of Capital

Under TELRIC, the cost of capital, which is the cost that SBC will incur to raise investment capital, must be "forward-looking," *see* 47 C.F.R. § 51.505(b)(2), which means that it must represent the appropriate risk-adjusted cost of capital that would exist in a competitive market, *see TRO* ¶ 680. The cost of capital is the product of three elements: the cost of debt, the cost of equity, and the capital structure. Neither party has challenged the ICC's determination of the cost of debt or the cost of equity, but SBC is challenging the ICC's capital structure determination. (R. 31, SBC's Mem. at 8.)

---

[16] Even if the *Virginia Arbitration Order* imposed a heightened burden of proof on SBC with respect to financial depreciation lives, Dr. Vanston's extensive testimony indicates that the ICC was more than justified in concluding that SBC satisfied its burden of proof. (*See* R. 42, SBC's App., Exs. 17-18, Vanston Testimony.)

[17] The ICC heard the evidence that the CLECs have submitted to this Court and was unpersuaded by it. (*See* R. 33, Pls.' App., Ex. 12, Majoros Testimony at 30-31.)

[18] The CLECs also assert that the ICC adopted these shorter depreciation lives to encourage SBC to invest in new technology by inappropriately "inflating" UNE rates. (R. 35, Pls.' Mem. at 18-19.) "[Efficient] facilities investment," however, is one of the "central purposes of the 1996 Act." *TELRIC NPRM* ¶ 3. Regardless, we lack the expertise and information to determine whether these new UNE rates are inflated.

17

SBC first asserts that the ICC violated TELRIC by adopting a capital structure that was not based on market values.[19] (*Id.*) SBC claims that "TELRIC requires that the capital structure used to compute the cost of capital be based exclusively on market values." (R. 48, SBC's Reply at 2.) According to SBC, this requirement was promulgated in the following paragraph of the *Virginia Arbitration Order*:

> In calculating TELRIC prices, the theoretically correct capital structure is based on market values of debt and equity, not book values. In section 252(d)(1) of the Act, Congress specifically prohibited the use of traditional rate-base, rate-of-return ratemaking. The Commission has interpreted this section to require prices based on forward-looking costs, because forward-looking costs best replicate the costs a carrier would face in a market with facilities-based competition. Under the Commission's TELRIC rules, we calculate the investment necessary to build a network using the most efficient technology currently available. The TELRIC rules provide for the recovery of the investment in that efficient network through the use of economic depreciation and they provide for a return on that investment through a risk-adjusted cost of capital. The book value of Verizon's existing network is irrelevant for these purposes. Investors would not earn the return that they require if a cost of capital that is based on book value is applied to the economic value of their assets, given that rational investors value these assets at market value. Thus, the use of a capital structure based on market values, rather than book values, represents a departure from traditional ratemaking, but one that is entirely appropriate under the Act.

*Virginia Arbitration Order* ¶ 102 (footnotes excluded). In this paragraph, the FCC stated that the use of market values is "theoretically correct" and that book values are "irrelevant for these

---

[19] The CLECs assert that SBC is judicially estopped from challenging the ICC's order because SBC successfully argued before the FCC in its 2003 application for long-distance services that the UNE rates previously set by the FCC were TELRIC-compliant. (R. 49, Pls.' Resp. at 7.) *See Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992). SBC is not judicially estopped because: (1) the issues raised by SBC were not litigated in that earlier proceeding and (2) SBC's arguments are not inconsistent with the arguments it raised in that proceeding. *See* Order, *In the Matter of Joint Application by SBC Communications Inc., Illinois Bell Telephone Company, Indiana Bell Telephone Company Incorporated, the Ohio Bell Telephone Company, Wisconsin Bell, Inc., and Southwestern Bell Communications Services, Inc. for Authorization to Provide In-Region, InterLATA Services in Illinois, Indiana, Ohio, and Wisconsin*, 18 F.C.C.R. 21543, ¶¶ 38-62 (rel. Oct. 15, 2003). Accordingly, we can properly address SBC's challenges to the ICC's order.

purposes." (*Id.*) It did not state—as SBC claims—that market values are required and should be used exclusively.

Furthermore, we decline to imply that the FCC intended to promulgate such a bright-line rule. The FCC was conducting a baseball arbitration. *See Virginia Arbitration Order* ¶ 103. In a baseball arbitration, the parties each advance one proposal. The arbitrator must select either proposal but cannot split the difference or impose a different resolution. The FCC soundly rejected the use of book values, but its endorsement of market values did not establish that using them is the exclusive method of calculating TELRIC-compliant capital structures. *Id.* ¶ 102. Moreover, the final sentence of this paragraph simply stated that the use of market values is "entirely appropriate." *Id.* Finally, if the FCC had established a bright-line rule it would not have subsequently sought comments on the question, "How should states determine the appropriate capital structure?" *TELRIC NPRM* ¶ 85. Rather, it either would not have posed the question or would have incorporated the mandated method into the question. In sum, the FCC's *Virginia Arbitration Order* rejected the use of book values and held that the use of market values is "theoretically correct" and "entirely appropriate," but did not mandate that a state commission exclusively rely on market values when making a capital structure determination.

SBC also claims that the ICC violated TELRIC by refusing to assume a fully competitive market when adopting a capital structure. (R. 31, SBC's Mem. at 10.) The ICC adopted its staff's capital structure proposal, which was "based upon [an] analysis of the interest coverage ratios of the comparable companies in its sample, all having A/A- credit ratings." (ICC Order at 84, 86.) In adopting this proposal, the ICC agreed with its staff's assumption that "equity rates should reflect something less than full competition." (*Id.* at 84.) Using this assumption, the ICC's staff used the interest coverage ratios of a sample of "partially rate-regulated"

telecommunications companies —which faced a moderate level of competitive risk—to determine a TELRIC-compliant capital structure. (*See* R. 32, SBC's App., McNally Direct at 29-31; McNally Rebuttal at 6, 12.)

The ICC's assumption violated TELRIC. Michael McNally, the witness who testified in support of the staff's proposal, claimed that this assumption was TELRIC-compliant for various reasons. He stated that the FCC —in the summary of an unpublished order—stated that rates for UNEs should reflect the risk of competition and noted that the cost of capital may differ across UNEs. (R. 32, SBC's App., McNally Direct at 29.) On the basis of these unpublished statements, McNally concluded that "the fact that UNE loop rates remain regulated indicates that the rates should not reflect risk levels associated with competition unimpeded by regulatory restraints (i.e., a high degree of competition)." (*Id.* at 29-30.) He did not provide (nor have the parties) any specific citation to the FCC statements on which he relied, and we have not been able to find them in the now published order. *See* Order on Remand, *In the Matter of Unbundled Access to Network Elements*, 20 F.C.C.R. 2533 (rel. Feb. 4, 2005). McNally also told the ICC that "the FCC has not instructed states to reflect either 'full' or 'ubiquitous' facilities-based competition in the cost of capital used to set UNE prices, but has instructed states to reflect an unspecific level of facilities-based competition." (R. 32, SBC's App., McNally Rebuttal at 2-3.) The FCC has never used the word "full" to describe a TELRIC-compliant competitive market, but it has used the word "ubiquitous." *Virginia Arbitration Order* ¶¶ 32, 93. In the *Virginia Arbitration Order*, the FCC stated that a state commission must assume "widespread facilities-based competition" where the ILEC "faces or potentially faces a ubiquitous competitor that uses only the most efficient technology and network configuration" that has been "deployed ubiquitously." *Virginia Arbitration Order* ¶¶ 32, 93. Additionally, the FCC stated in the *TRO*

that a state commission must assume a competitive market in which "all facilities-based carriers would face the risk of losing customers to other facilities-based carriers." *TRO* ¶ 680. Thus, the ICC wrongly held that TELRIC permitted it to assume something less than ubiquitous competition.

The ICC maintains it has the discretion to "consider the competition the [ILEC] is expected to face in the future." (R. 45, ICC's Resp. at 47.) The ICC attributes this discretion to Paragraph 114 of the *Local Competition Order* and Paragraphs 676 and 681 of the *TRO*. (We assume that the ICC's reference to Paragraph 682 was a scrivener's error.) Paragraph 114 of the *Local Competition Order* states that state commissions can consider "local technological, environmental, regulatory, and economic conditions," but does not address the cost of capital or TELRIC-compliant competitive markets. Paragraph 681 of the *TRO* states that "future competition must be considered," but the ICC must nonetheless assume the level of future competition previously described. Furthermore, Paragraph 676 only states that the ICC was not making any "fundamental changes to the theory underlying the TELRIC rules." Requiring that the ICC assume ubiquitous future competition is not a fundamental change.[20] Thus, none of these statements suggest that the ICC has the discretion to ignore the FCC's specific mandate that state commissions must assume a ubiquitous competitive market.

Additionally, the ICC's erroneous assumption caused it to incorporate the current level of competition facing partially-regulated companies into its capital structure determination. The FCC has stated that the cost of capital should not be based on the current status of competition

---

[20] The CLECs also assert that the ICC could assume a level of competition that ranged from "that of a regulated monopoly to that of 'perfect' competition." (R. 49, Pls.' Resp. at 13.) Because the FCC specifically described a ubiquitous competitive market, we disagree. Furthermore, we must note that TELRIC would not be the least bit forward-looking if the ICC had the discretion to assume that an ILEC would continue to operate as a regulated monopoly.

because it should "reflect[] the competitive risks associated with participating in the type of market that TELRIC assumes." *TRO*, ¶ 680; *see also Virginia Arbitration Order*, ¶ 63 (stating that "the cost of capital used in this proceeding must reflect the risks of a market in which [the ILEC] faces facilities-based competition"). The ICC, however, explicitly stated that it did not have to assume ubiquitous competition because "reality is something less than that." (ICC Order at 84.) The ICC asserts that the word "reality" refers to the "competitive market that TELRIC assumes." (R. 45, ICC's Resp. at 47.) This interpretation is utterly incongruous with the word's ordinary meaning—a real event, entity, or state of affairs—because TELRIC requires the ICC to assume a hypothetical, ubiquitous competitive market. Furthermore, the ICC's novel interpretation is belied by the evidentiary record. McNally testified that this assumption was proper because the relevant UNE rates "remain regulated" and are "not fully competitive." (R. 32, SBC's App., McNally Direct at 31-32.) Thus, the ICC and its staff both considered (to some unknown degree) the current status of competition when determining capital structure.[21]

For these reasons, we reverse the ICC's capital structure determination because it is inconsistent with FCC's interpretation of its TELRIC pricing rules. The ICC must re-calculate the cost of capital and in doing so, as explained above, must assume a ubiquitous competitive market.

---

[21] We also reject the CLECs and the ICC's argument that a fully or ubiquitously competitive market is the same as a perfectly competitive market. (R. 45, ICC's Resp. at 46; R. 49, Pls.' Resp. at 13-14.) The Supreme Court stated in *Verizon*, 535 U.S. at 504, that "TELRIC does not assume a perfectly efficient wholesale market or one that is likely to resemble perfection in any foreseeable time." *See also Virginia Arbitration Order* ¶ 32. Perfect competition is an economic concept while full or ubiquitous competition currently exists in unregulated industries. For example, the interest coverage rates based on the industrial medians reflect the high competitive risk level that exists in fully competitive markets. (*See* R. 32, SBC's App., McNally Direct at 31.)

### 2. Additional Inputs

In addition to the three major inputs discussed above, the ICC had to make numerous additional factual determinations. The CLECs challenge how the ICC determined installation rates and DLC investment costs. For the reasons provided below, we affirm the ICC's installation rates determination, but reverse one aspect of the ICC's DLC investment costs determination.

#### a. Installation Rates

Installation rates include the actual installation costs as well as the cost of the installed materials. (R. 35, Pls.' Mem. at 19.) Neither party disputes how the ICC calculated the cost of the installed materials, but the CLECs challenge how the ICC determined the installation costs. (*Id.*) The ICC used loading factors, which are ratios derived from SBC's historical installation rates.[22] (ICC Order at 96.) To calculate installation rates, the ICC multiplied forward-looking material costs with SBC's loading factors. (*See* R. 35, Pls.' Mem. at 20.)

The CLECs assert that the ICC should not have used the loading factor method because it double-counted material costs. (*Id.*; *see also* ICC Order at 92, 95.) Double-counting costs would violate the FCC's TELRIC rules. *See, e.g., AT&T Communications. v. Pac. Bell Tel. Co.* 375 F.3d 894 (9th Cir. 2005) (affirming district court's conclusion in *AT&T Communications v. Pac. Bell. Tel. Co.*, 228 F. Supp. 2d 1086, 1105 (N.D. Cal. 2002), that state commission's factual determination was arbitrary and capricious because the state commission failed "to provide any support for its position that it did not double count" costs). In support of this argument, the CLECs cite the testimony of Steven Turner—who spoke on behalf of a CLEC—that SBC,

---

[22] This method has been used by other state commissions as well. (*See* R. 42, SBC's App., Ex. 26, Ohio Order at 52, Ex. 27, Texas Order at 11-12, & Ex. 28, Wisconsin Order at 61.)

23

through its agent Donald Palmer, admitted that the loading factor method "results in significant doubling [sic] counting of installation costs." (R. 33, Pls.' App., Ex. 15, Turner Direct at 66-67.) Palmer, however, also testified before the ICC and provided the ICC with the entire statement on which the CLECS rely.[23] The ICC heard both Turner and Palmer's testimony and determined that the loading factor methodology did not double-count costs. (ICC Order at 96-97; *see also* R. 45, ICC's Resp. at 22-23.) Accordingly, the ICC's conclusion that the loading factor method did not double-count costs was supported by substantial evidence and thus was not arbitrary and capricious.

The CLECs next assert that "the way in which SBC developed its historical loading factors also violates the FCC pricing rules." (R. 35, Pls.' Mem. at 21.) They assert that "most of SBC's recent loop installations reflect only relatively small incremental additions to SBC's existing network," which are "much more costly on a per-unit basis than construction associated

---

[23] The specific question Palmer was asked and his entire answer are provided below. The italicized portion is the section cited by the CLEC's.

Q.    Is Mr. Turner correct in his assertion that the Alcatel contract prices also include the cost of installing that equipment in SWBT's central offices and remote terminal locations?

A.    Absolutely not. The Alcatel contract prices do not include the installation costs that SWBT [SBC Texas] incurs to install this equipment in SWBT's central offices and remote terminal locations and never have. This fact has been confirmed with Alcatel as pointed out in the rebuttal testimony of SWBT witness, Mr. Trott. *The prices contained in the Exhibit B price list reflect only the net price of the equipment itself plus, where applicable, any pre-delivery labor and miscellaneous materials associated with specific per-assembled Litespan configurations that Alcatel is responsible for prior to delivery or shipment to SBC.* These prices have never reflected the added costs associated with SWBT's engineers and technicians and third-party contractors who [are] actually placing and installing this equipment in SWBT's central offices and remote terminal sites once the equipment has been received from Alcatel. These additional activities are described in more detail in the respective rebuttal testimony of SWBT witnesses Mr. Trott (remote terminals) and Mr. Ellis (central office terminals).

(R. 42, SBC's App., Ex. 11, Palmer Rebuttal at 9.)

with an entirely new efficient replacement network." (*Id.*) This slant toward smaller projects, according to the CLECs, caused the loading factors to "greatly overstate the forward-looking unit costs of a large-scale replacement network." (*Id.*) As with the double-counting issue, this factual question was debated by various experts before the ICC. The ICC ultimately decided that SBC's historical data was sufficient to enable it to determine forward-looking costs. (ICC Order at 96.) The ICC considered the CLECs' economies of scale argument, (*see id.* at 93; *see also* R. 45, ICC's Resp. at 23-24), and found it unconvincing because: (1) SBC's data "includes numerous smaller expansions" (and thus by implication included larger expansions) and (2) "even a forward-looking network requires replacements and augmentations from time to time," (ICC Order at 96). Accordingly, the ICC's decision was supported by substantial evidence and was not arbitrary and capricious.

The CLECs also claim that the ICC's decision to include small construction projects violated TELRIC because the Supreme Court, in *Verizon*, 535 U.S. at 540, stated that state commissions must assume that the company will "build essentially from scratch a new, perfectly efficient communications network." This statement, however, was from Justice Breyer's concurring and dissenting opinion so cannot be attributed to the entire court. The majority opinion did quote a paper that stated that state commissions can assume that a network will be built from scratch, but this quote was made to support the argument that TELRIC pricing will be no more difficult than traditional ratemaking. *Id.* at 522. The Supreme Court's tangential citation of this paper does not establish that a state commission must assume that an entire network will be built from scratch when determining installation rates. Especially when the FCC stated in the *TELRIC NPRM* that "the UNE pricing methodology, while forward-looking, must be representative of the real world and should not be based on the totally hypothetical cost of a

most-efficient provider building a network from scratch." *TELRIC NPRM*, ¶¶ 50, 53. The

CLECs assert that this statement is from a proposed rulemaking and is thus non-binding. (*See* R.

61, Pls.' Reply at 16.) It nonetheless provides extremely relevant insight into the FCC's view of

forward-looking installation rates. The FCC also stated in the *Virginia Arbitration Order* that

technology will be deployed "over a period of time." *Virginia Arbitration Order*, ¶ 32.

Accordingly, we find that the ICC's decision to use loading factors based on SBC's actual

installation rates did not violate TELRIC.

Finally, the CLECs assert that SBC's loading factors violated TELRIC because they

assume a "direct relationship between the cost of the underlying materials and equipment and the

cost of installing that equipment." (R. 35, Pls.' Mem. at 22.) The ICC stated that loading factors

"reflect, and are intended to capture, the average installation costs across the network." (ICC

Order at 96.) The CLECs counter that using "average installation costs across the network"

violates the FCC's requirement that rates must be "geographically deaveraged." *Local*

*Competition Order* ¶ 764; 47 C.F.R. § 51.507(f) ("State commissions shall establish different

rates for elements in at least three defined geographic areas within the state to reflect geographic

cost differences."). While the final rates must be deaveraged, the CLECs have provided this

Court with no support for their argument that each input into the recurring cost studies must also

be deaveraged.[24] Furthermore, the ICC specifically considered whether using average installation

costs would distort deaveraged UNE costs. (*See* R. 33, Pls.' App, Ex. 15, Pitkin/Turner Direct at

---

[24] The installation rate method that the CLECs proposed to the ICC did not deaverage rates either. (*See* ICC Order at 93 (stating that the CLECs proposed using "average" construction cost estimates).) Thus, the ICC was never presented with a method to calculate deaveraged installation rates. Furthermore, SBC maintains—and no party has asserted otherwise—that deaveraged installation rates cannot be calculated with current data. (R. 42, SBC's App., Ex. 15, Smallwood Rebuttal at 56-57.)

43; R. 42, SBC's App., Ex. 15, Smallwood Rebuttal at 56-57.) The ICC heard testimony supporting both sides of this argument, (*id.*), and ultimately concluded that "use of average based installation cost methodology is appropriate for purposes of setting UNE loop prices," (ICC Order at 96; *see also* R. 45, ICC's Resp. at 26-27). Accordingly, we find that the ICC's decision to use SBC's loading factors was consistent with TELRIC and supported by substantial evidence.

### b. Digital Loop Carrier Investment Cost

The ICC also had to determine DLC investment costs. The CLECs challenge two aspects of the ICC's DLC investment cost determination. They challenge the ICC's decision to include smaller Remote Terminals ("RTs") as well as the mix of DLC equipment that the ICC included in the recurring cost studies. For the reasons provided below, we affirm the ICC's decision to include smaller RTs but reverse its decision to include a mix of DLC equipment.

### i. Remote Terminals

DLC systems use Remote Terminals ("RTs") to convert analog signals into digital signals. SBC presented a cost study to the ICC that contained two RT sizes, but SBC revised this study in response to an ICC staff proposal to include smaller RTs. (ICC Order at 99.) The CLECs assert that the ICC's decision to include the smaller RTs was arbitrary and capricious because it increased costs. (R. 35, Pls.' Mem. at 24-25.) The CLECs assert that costs increased because the DLC fill factors were not increased to reflect the higher utilization rates of these smaller RTs. (*Id.* at 25.) The ICC declined to increase the fill factors because "SBC's fill factors are based on actual data from its existing network, which includes numerous even smaller [RTs]." (ICC Order at 101.) The CLECs do not dispute the fact that SBC's fill factors already incorporated the fill factors of smaller RTs but assert nonetheless that the ICC's decision was

arbitrary and capricious because the purpose of including the smaller RTs was cost reduction.[25] (R. 61, Pls.' Reply at 17-18.) For example, the ICC's staff witness stated the he would reconsider recommending including smaller RTs if costs would increase, (R. 33, Pls.' App., Ex. 17, Koch Testimony at 1918-19), and the ICC stated that failing to include the smaller RTs could inflate costs, (ICC Order at 101). The CLECs' reliance on these statements is unpersuasive because the ICC knew that the effect of including these smaller RTs would be, "all other things being equal, to increase loop costs." (*Id.* at 100.) Furthermore, the ICC addressed and specifically rejected the CLECs' argument. (*Id.* at 100-101.) The ICC knew that smaller RTs were more costly than larger systems in terms of investment per unit of capacity, but concluded that their inclusion more accurately reflected TELRIC forward-looking costs. (*See* R. 42, SBC's App., Ex. 15, Smallwood Rebuttal at 78.) We must defer to the ICC's technical expertise and judgment, so cannot find that its decision to include smaller RTs was arbitrary and capricious.

### ii.    Mix of DLC Equipment

There are two types of DLC equipment: Universal Digital Loop Carriers ("UDLCs") and the newer, more efficient Integrated Digital Loop Carriers ("IDLCs"). The ICC included in its recurring cost study a mix of 12% IDLC equipment and 88% UDLC equipment after concluding that IDLCs "cannot be effectively unbundled." (ICC Order at 106.) This ICC decision violated TELRIC because the FCC stated in the *Virginia Arbitration Order* that "a TELRIC model should

---

[25] The CLECs counter that the fill factors violated TELRIC because they represent embedded costs. (R. 61, Pls.' Reply at 18.) While explaining that TELRIC bars reliance on embedded costs, the CLECs did not explain how or why these fill factors represent embedded costs. (*Id.*) We need not address this conclusory rebuttal argument because the CLECs did not raise this embedded cost argument in their opening memorandum. Accordingly, the CLECs waived this argument. *See Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004). Moreover, we have already rejected all of the CLECs' challenges to the ICC's fill factors. *See supra* Section I(A)(1)(a).

use" 100% IDLC equipment. *Virginia Arbitration Order* ¶ 312. The ICC asserts that these FCC

statements are not binding because the ILEC in that arbitration failed to meet its burden of

proving that this unbundling technology is not currently available.[26] (R. 45, ICC's Resp. at 31

n.8.) The ICC's reliance on the burden of proof is unavailing because the FCC definitively stated

that "the record demonstrates that it is technically feasible to unbundle [IDLC] loops, and that

this technology is currently available." *Id.* ¶¶ 315, 322; *see McCarty*, 362 F.3d at 386 (stating

that we must defer to the FCC's interpretation of its own rules); *see also Indiana Proceeding*,

2004 Ind. PUC LEXIS at 123 ("We agree with the FCC Wireline Competition Bureau, that the

use of UDLC in developing unbundled loop costs is inconsistent with TELRIC."). The FCC's

Wireline Competition Bureau decided this issue after reviewing a "voluminous record," so there

is no need for state commissions to continue to address it. Accordingly, we find that the ICC

violated TELRIC when it failed to assume 100% IDLC equipment in its recurring cost studies.

---

[26] SBC claimed that the FCC has found subsequent to the *Virginia Arbitration Order* that "there still is no good way to unbundle loops from IDLC." (R. 48, SBC's Resp. at 28-29.) It failed, however, to provide this Court with any subsequent statements. Furthermore, SBC and the ICC only cited precedents that pre-date the *Virginia Arbitration Order*. *See* Third Report and Order and Fourth Further Notice of Proposed Rulemaking, *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 15 F.C.C.R. 3696, n.418 (rel. Nov. 5, 1999), as modified by Erratum (rel. Jan. 14, 2000); Order, *In the Matter of Application by Verizon Virginia Inc., Verizon Long Distance Virginia Inc., Verizon Enterprise Solutions Virginia Inc., Verizon Global Networks, Inc., And Verizon Select Services of Virginia Inc., For Authorization to Provide In-Region, InterLATA Services In Virginia*, 17 F.C.C.R. 21880, ¶ 148 (rel. Oct. 30, 2002); Order, *In the Matter of Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services in Georgia and Louisiana*, 17 F.C.C.R. 9018, ¶ 50 (rel. May 15, 2002); Order, *In the Matter of Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in Alabama, Kentucky, Mississippi, North Carolina, and South Carolina*, 17 F.C.C.R. 17595, ¶ 62 (rel. Sept. 18, 2002).

## B.  Non-Recurring Cost Studies

The ICC also conducted numerous non-recurring cost studies. The CLECs challenge one aspect of the ICC's service order cost studies and two aspects of the ICC's provisioning cost studies.[27] For the reasons provided below, we affirm the ICC's service order cost studies and find that one aspect of the ICC's provisioning cost studies was arbitrary and capricious.

### 1.  Service Order Cost Studies

The service order cost studies determined the cost that SBC incurs when a CLEC places a service order. In order to determine that cost, the ICC had to determine the percentage of service orders that SBC must process manually, which is known as the fallout rate because these orders "fall out" of SBC's electronic processing system. The CLECs claim that the ICC acted arbitrarily and capriciously when it concluded that "the percentage of orders that fallout for manual support is a different question from the frequency with which a specific manual support activity occurs." (ICC Order at 171.) Instead of including support activity within the fallout rate, the ICC determined the specific costs associated with these support activities, which it referred to as occurrence probabilities. (ICC Order at 160.)

The CLECs assert that the ICC should have considered support activity as part of the fallout rate because it is another form of manual intervention. (R. 35, Pls.' Mem. at 27; R. 61, Pls.' Reply at 20.) The ICC is not, however, required to determine one universal manual activity cost, so had full discretion to independently consider different types of manual activity as long as each cost was TELRIC-compliant. The ICC's decision to include support activities in its non-

---

[27] In their opening brief, the CLECs challenged a third aspect of the provisioning cost studies. (R. 35, Pls.' Mem. at 30-31.) They stated in their reply brief, however, that "they no longer intend to pursue relief on this issue in this case." (R. 61, Pls.' Reply at 23.) Therefore, we have not addressed this issue.

recurring cost studies was supported by substantial evidence, (*see* ICC Order at 152, 156, 161; R. 45, ICC's Resp. at 35; R. 42, SBC's App., Ex. 7, Brown Direct at 15-17), as was its decision to consider support activities independently from the fallout rate, (*see* ICC Order at 166; R. 45, ICC's Resp. at 34). Thus, the ICC's decision was supported by substantial evidence and was not arbitrary and capricious.

### 2. Provisioning Cost Studies

#### a. Design Costs

The CLECs assert that the ICC arbitrarily and capriciously included design costs for Plain Old Telephone Service ("POTS") loops in the provisioning cost studies. (R. 35, Pls.' Mem. at 28-29; R. 61, Pls.' Reply at 21.) They claim that there are no design costs associated with these loops, (*id.*), while SBC and the ICC assert that all loops must be designed, (R. 48, SBC's Resp. at 31; R. 45, ICC's Resp. at 35-37). The record contains evidence supporting the ICC's decision to include these costs, (*see* R. 42, SBC's App., Ex. 22, Gomez-McKeon Rebuttal (stating that all loops are designed)), so we find that the ICC's decision was supported by substantial evidence.

The CLECs nonetheless assert that this decision was arbitrary and capricious because an SBC witness stated that POTS loops are not designed. (*See* R. 33, Pls.' App., Ex. 20, Cass Direct at 26.) We acknowledge that SBC presented evidence that was slightly contradictory, but this minor discrepancy does not render the ICC's decision arbitrary and capricious. The ICC was aware of this contradiction—which was explicitly raised by its staff as part of the staff's broader objection to SBC's design costs. (ICC Order at 176.) The ICC, however, addressed this objection by compromising. (ICC Order at 178.) Instead of disallowing all costs for some loops, the ICC only allowed the lowest costs for all loops. (*Id.*) This compromise addressed this small

31

discrepancy in SBC's testimony and was an exercise of the ICC's judgment to which this Court must defer.

### b.    Travel Times

The CLECs assert that the ICC's reliance on technicians' estimates of the time it takes them to travel to unmanned central offices was arbitrary and capricious because the ICC explicitly stated that it was not appropriate to rely on these estimates.[28]  (R. 35, Pls.' Mem. at 29.) SBC and the ICC claim that the ICC properly concluded that SBC's proposal was the most reasonable (given the fact that all of the proposals were based on technicians' estimates) and was simply instructing the parties to use statistical analysis in the future.  (R. 48, SBC's Resp. at 32; R. 45, ICC's Resp. at 37-38.)  This argument, however, categorically ignores the fact that the ICC explicitly stated that "estimates may be appropriate in other areas of SBC's cost studies, but not here."  (ICC Order at 186.)  Once the ICC concluded that technician's estimates were not an appropriate basis for its decision, it was arbitrary and capricious for the ICC to rely on them.[29] *See Schurtz Communications*, 982 F.2d at 1053 (stating that a commission cannot silently pass over a contradiction).

---

[28] The ICC asserts that it "generally concluded that the use of [technicians'] estimates is one permissible method of determining non-recurring costs," (*see* R. 45, ICC's Resp. at 38, quoting ICC Order at 149), but this general conclusion does not trump its specific finding that these estimates were inappropriate with respect to travel times—especially when the ICC stated that it will address the problems with technicians' estimates "in the context of the specific adjustments," (*id.*).

[29] While the ICC explained in its response brief that technicians' estimates were simply a "less preferable" estimator of travel times, (R. 45, ICC's Resp. at 38), this meaningful explanation was wholly absent from its order and is inconsistent with the ICC's actual statement. Thus, even if the ICC did not mean what it said, the absence of this meaningful explanation would nonetheless render its decision arbitrary and capricious.

## C.    Common Costs

Common costs are costs that are not directly attributable to any single product or service, but are instead common to all products or services, such as executive compensation and other human resources expenses. In order to allocate a portion of SBC's common costs to UNEs, the ICC had to determine a TELRIC-compliant common cost factor, which is the ratio of common costs (the numerator) to direct costs (the denominator). The ICC then multiplied the UNEs' direct costs with this common cost factor to calculate the UNEs' common costs.

The CLECs assert that the ICC erroneously calculated the common cost factor because it used SBC's actual common costs in the numerator and hypothetical, forward-looking direct costs in the denominator. (R. 61, Pls.' Reply at 24.) They contend that the ICC should have been consistent by using either actual costs or forward-looking costs for both the numerator and the denominator. (*Id.*) The ICC considered and specifically rejected these arguments. (ICC Order at 227-28, 229-30.) It found that the numerator, although based on actual data, was "sufficiently forward-looking, as adjusted by this Order to be appropriate for use in [SBC's] studies." (*Id.* at 229.) It also found that actual data should not be used in the denominator because direct costs, to be consistent with TELRIC, "should be developed on a forward-looking basis." (*Id.* at 230.)

The CLECs raise various challenges to the ICC's decision. First, they claim that the ICC "ignored the fact that the record does not contain a single forward-looking adjustment to the numerator." (R. 35, Pls.' Mem. at 32.) Yet the ICC made numerous adjustments, which lowered the numerator, to ensure that it was TELRIC-compliant. (*See* ICC Order at 227, 237, 241.) Next, the CLECs claim that it is "nonsensical and unsupportable" to use actual data to calculate common costs and hypothetical, forward-looking data to calculate direct costs. (R. 35, Pls.' Mem. at 33.) A telephone network built with the most efficient, currently available technology

33

would greatly reduce direct costs, but would not have the same significant effect on common costs, such as overhead and executive compensation. (*See* R. 48, SBC's Resp. at 34.) The ICC's decision is thus both sensible and supported by the record because the ICC stated that the "CLECS have not identified any technologies or practices that could be expected to materially change the costs associated with common overhead functions in the future." (ICC Order at 229.)

The CLECs also claim that the ICC "ignored overwhelming record evidence of productivity enhancements that were not incorporated into the common cost portion of the equation" as well as the fact that SBC stated that it expects to save $1.3 billion in annual capital and expense by 2006 through workforce reductions and productivity improvements. (R. 35, Pls.' Mem. at 33-34.) The ICC did not ignore that evidence. To the contrary, it considered it and found that these productivity enhancements and improvements would affect both common and direct costs, so would have no effect on the common cost factor. (ICC Order at 230; *see also* R. 42, SBC's App., Ex. 6, Barch Surrebuttal at 33-35.) Finally, the CLECs note that an Administrative Law Judge and the Indiana Regulatory Utility Commission reached a different conclusion when addressing this specific question. (R. 35, Pls.' Mem. at 32, 34.) Neither of these decisions are binding on the ICC, so they are not relevant to whether the ICC acted arbitrarily and capriciously. The ICC considered all the relevant information, relied on substantial evidence, and provided a meaningful explanation for how it calculated the common cost factor. Accordingly, we must affirm the ICC's decision regarding common costs.[30]

---

[30] The CLECs also claim that "the ICC improperly shifted the burden of proof that the FCC imposes on [ILECs] to show that their cost studies are TELRIC-compliant." (R. 35, Pls.' Mem. at 35.) They have not explained how the ICC shifted this burden of proof, which makes it impossible for this Court to address this argument.

## CONCLUSION

The ICC's 299-page order contained a broad array of legal and factual determinations. We commend the ICC for its ability to properly make so many complicated, technical decisions in such an expedited fashion. The parties have only challenged ten specific decisions in this lengthy order, which is a testament to the thoroughness of the ICC's order. After concluding that the ICC proceeding was not preempted by the 1996 Act, we reviewed each challenged decision and concluded that the ICC made two legal errors and once acted arbitrarily and capriciously. We have specifically explained how the ICC should remedy the legal errors, but have not provided an explicit remedy for the ICC's arbitrary and capricious action. We trust that upon reconsideration of this factual question the ICC will make a decision that is both supported by substantial evidence and the result of a deliberate principled reasoning process.

We grant both the CLECs' and SBC's summary judgment motions. (R. 34-1; R. 59-1.) The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of Plaintiffs Mpower Communications Corp., Forte Communications Inc., CIMCO Communications, Inc., and XO Illinois, Inc. and in favor of Intervening Defendant SBC. Accordingly, we remand this case back to the ICC for further proceedings.

ENTERED: _____
          **Judge Ruben Castillo**
          **United States District Court**

**Dated: July 29, 2005**